George ALEXANDER, Jr.

v.

William B. ROBINSON, Julius T. Cuyler, Edmund Gaffney and Francis Collins.

Civ. A. No. 77–1703.

United States District Court, E. D. Pennsylvania.

Jan. 22, 1979.

Jeffrey L. Pettit, Philadelphia, Pa., for plaintiff.

Maria Parisi Vickers, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the Court are: (1) the motion of defendant Francis Collins ("Collins") for summary judgment, pursuant to Fed.R.Civ.P. 56; (2) the motions of defendants William B. Robinson ("Robinson"), Julius T. Cuyler ("Cuyler") and Edmund Gaffney ("Gaffney") for summary judgment, pursuant to Fed.R.Civ.P. 56; and, (3) the motion of the plaintiff George Alexander, Jr. ("Alexander"), for summary judgment, pursuant to Fed.R.Civ.P. 56. For the reasons stated below, the motions of all defendants have been granted and Alexander's motion has been denied.

Alexander filed a *pro se* complaint in this Court [1] alleging jurisdiction under 28 U.S.C. § 1343 and alleging causes of action under 42 U.S.C. §§ 1983 through 1985 for the infliction of cruel and unusual punishment because of faulty and incomplete medical treatment, in violation of the Eighth Amendment, as applied to the states through the Fourteenth Amendment. Alexander seeks monetary, injunctive and declaratory relief and names as defendants Robinson, the Commissioner of the Bureau of Correction; Cuyler, the Superintendent of the State Correctional Institution at Graterford; and, Gaffney and Collins, physicians employed on a part-time basis at Graterford.

The Court is presented with cross-motions for summary judgment by Alexander and all defendants, each of whom argues that there is no material issue of fact and that each is entitled to a judgment in his favor as a matter of law. While the Court notes that the mere fact that it is presented with cross-motions for summary judgment does not, by itself, indicate that the controversy is ripe for adjudication, *Rains v. Cascade Industries, Inc.*, 402 F.2d 241 (3d Cir. 1968); however, in the case at bar, there is substantial agreement as to the facts and, when the facts are viewed in the light most favorable to Alexander, the Court finds that the defendants are entitled to a judgment in their favor as a matter of law.

In his motion, Alexander states that he relies on: (1) the transcript of his deposition taken on October 10, 1978 [Document # 20]; (2) photocopies of certain medical reports attached to the motion of Collins, which consist of a Bureau of Prisons Medical Report, two dispensary cards and a consultation record; and, (3) a photocopy of an inmate request form from Alexander to Cuyler requesting access to the legal aid clinic at Graterford. Collins states that he relies upon the same deposition of Alexander, as well as upon the same medical records enumerated above. Cuyler, Robinson

and Gaffney incorporate by reference the same sources relied upon by Collins and Alexander. Based upon these sources of fact, the Court makes the following narrative description of the facts of the case, *see* Fed.R.Civ.P. 56(c).

Alexander was incarcerated at Graterford on January 2, 1977, upon conviction on charges of robbery, for which he was sentenced to a term of two to five years. [Alexander Deposition, p. 5.] He was placed in the Behavioral Modification Unit ("B.M.U.") at Graterford on his own request for protective segregation about a month and a half after his arrival. *Id.*, p. 13. On March 13, while leaving the shower at the B.M.U., Alexander slipped and fell on a drain pipe, injuring his back. *Id.*, pp. 14, 22, 25. He remained on the floor for about twenty minutes, experiencing pain, dizziness and some loss of consciousness. *Id.*, p. 15. Within an hour of his fall, Alexander was driven to the prison hospital by two guards. *Id.*, pp. 27–28. Upon arrival at the prison hospital, he was taken to the X-ray room where two complete sets of X-rays were taken of his back and right leg. *Id.*, pp. 28–30. Shortly thereafter, he was examined by a physician he thought was named "Gaffney." *Id.*, pp. 30, 34, 87. The doctor prescribed medication which Alexander believed was called "Robaxin," examined his vital functions, viewed the X-rays and examined Alexander's back and right leg. *Id.*, pp. 32–34. Upon completion of the examination, the doctor told Alexander that he had no broken bones, no slipped discs and no torn ligaments. *Id.* A dispensary card dated March 23, 1977, shows that a muscle relaxant and a pain medication were prescribed at that time.

Alexander stated that this physician also indicated that he should consult a "back specialist," by whom he was subsequently examined. *Id.*, pp. 57, 88.

The Consultation Record of the Bureau of Correction indicates that on March 25, 1977, Dr. F. S. Winter, a certified radiologist, examined the X-rays taken on March 23

---

1. Alexander has since retained counsel who assisted in the preparation of the plaintiff's motion and in the opposition to defendant's motion.

and found no evidence of joint or bone injury and the alignment of the spine was normal. Several days after the fall, Alexander was again seen by a doctor in the B.M.U. *Id.,* pp. 36–37. At this time, Alexander stated that he was taking pain medication four times daily, and he requested that this medication be changed. This request was denied by the physician. *Id.,* pp. 38–39.

One week after the fall, Alexander was seen by a physician and, once again, he requested a change in medication. This request was also denied. *Id.,* pp. 39–40. He continued to take the prescribed medication. *Id.* A day or two later, Alexander was seen by another doctor in the B.M.U. (*Id.,* pp. 40–41) and the medication was changed to what Alexander believes was "Tylenol," which he received twice a day for about seven days. *Id.* About nine days after the fall, Alexander was seen once again by a physician (*Id.,* p. 45) and this doctor refused to change his medication. *Id.* Several days later, Alexander was again seen by a doctor. *Id.*

About three weeks after the fall, Alexander's condition improved and he began to exercise, doing sit-ups, jumping-jacks and running. *Id.,* pp. 40, 47. After suffering a relapse, Alexander was instructed by a physician to cease exercising (*Id.,* pp. 49–50) and his medication was changed. After about eight days, he began to feel better. *Id.*

█ The only factual dispute in this case arises over the examination by the "back specialist." Alexander described being examined by roughly four different physicians over the course of the treatment, one of whom he described as a "back specialist." Alexander contends that this specialist prescribed whirlpool baths, rubdowns and heat-lamp treatments and that these therapeutic measures were not taken. The defendants claim that the identity of the specialist is Dr. Kenan Umar, a neurologist, and that there is no record of any such treatment being prescribed. We find that it is not necessary for the Court to resolve this factual dispute because, even if we agreed with Alexander that he was not provided with certain therapy prescribed by a specialist, in light of the numerous examinations and consultations with various other physicians and the program of medication provided to him, we cannot find that the defendants' treatment rises to the level of cruel and unusual punishment, in violation of the Eighth Amendment to the Constitution of the United States.

The most recent articulation of the standard to be applied in determining whether a faulty course of medical care or the absence of such care rises to the level of cruel and unusual punishment is found in a Supreme Court case remarkably similar to the case at bar. In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 251 (1976), the Court was presented with a prisoner's complaint, the gravamen of which was that the prison authorities subjected the prisoner to cruel and unusual punishment through their allegedly faulty and incomplete treatment of his bad back and thus violated his rights under the Eighth and Fourteenth Amendments. After examining its Eighth Amendment decisions, the Court began with the premise that, under some circumstances, "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' . . . proscribed by the Eighth Amendment." *Id.,* at 104, 97 S.Ct. at 291 (citation omitted). The Court noted that not all deprivations of medical care would be so construed but that "an inadvertent failure to provide adequate medical care cannot be said" to rise to the level of cruel and unusual punishment. *Id.,* at 105, 97 S.Ct. at 292. Only such indifference to the medical needs of the prisoner that "offend[s] evolving standards of decency" will be held violative of the Eighth Amendment. *Id.,* at 106, 97 S.Ct. 285.

Applying these standards to the facts of the case before it, the Court stressed that the prisoner had been examined by medical personnel on 17 separate occasions spanning a three-month period and that various pain medications and muscle relaxants had been prescribed to reduce his back pain. *Id.,* at

107, 97 S.Ct. 285. The Court responded to the prisoner's contention that further diagnostic and therapeutic measures should have been taken, in light of his continued pain, by stating:

> But the question whether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act. . . .

*Id.* (footnote omitted). Measured against this standard, the treatment afforded the prisoner did not rise to the level of being "repugnant to the conscience of mankind" and, thus, did not constitute the infliction of cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments. The Court thus reversed the decision of the Court of Appeals, which had reversed the trial court's granting of summary judgment in favor of the defendants. *See also Gittle-macker v. Prasse,* 428 F.2d 1 (3d Cir. 1970); *Roach v. Kligman,* 412 F.Supp. 521, 525 (E.D.Pa.1976).

When measured against this standard, the treatment afforded Alexander plainly does not constitute an infliction of cruel and unusual punishment. We place particular emphasis upon the following facts: shortly after his fall, Alexander was driven to the prison hospital where he was X-rayed; he was examined by, and consulted with, various physicians on numerous occasions; and, his medication was continued for several weeks after his injury. By no means could this course of medical treatment be said to constitute "deliberate indifference."

Alexander places special emphasis upon the failure of the various physicians to change his medication at his request and upon the failure of the defendants to provide him with rubdowns, whirlpool baths and heatlamp treatments as prescribed by the back specialist. Taking these allegations as true, as we must for the purpose of defendants' motions, we nonetheless find that these claims are the equivalent of the claims for further treatment which the Supreme Court rejected in *Estelle.* We find, as did the Court in *Estelle,* that these claims are merely challenges directed at the medical judgment of the physicians and, as such, do not constitute an infliction of cruel and unusual punishment, in violation of the Eighth Amendment. Accordingly, we hold that there is no material issue of fact in the record before us, that all defendants are entitled to a judgment in their favor as a matter of law on the grounds that Alexander has not suffered an infliction of cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments, and that Alexander is not entitled to summary judgment in his favor as a matter of law.

This Memorandum is in support of the Order of this Court dated January 16, 1979, granting the motion of defendants and denying the motion of the plaintiff.