[S.F. No. 24637. July 29, 1985.]

GLORIA OCHOA et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
COUNTY OF SANTA CLARA et al., Real Parties in Interest.

**COUNSEL**

Jessie Serna for Petitioner.

Robert E. Cartwright, Leonard Sacks, Victoria J. De Goff, Wylie A. Aitken, Harlan Arnold, Glen T. Bashore, Ray Bourhis, Richard D. Bridgman, Edwin Train Caldwell, David S. Casey, Jr., Douglas K. de Vries, H. Greig Fowler, Sanford M. Gage, Ian Herzog, G. Dana Hobart, Stanley K. Jacobs, Harvey R. Levine, John C. McCarthy, Timothy W. Peach, Joseph Posner, Ribert H. Sulnick, John M. Van Dyke, Arne Werchick and Stephen I. Zetterberg as Amici Curiae on behalf of Petitioner.

Hassard, Bonnington, Rogers & Huber, William B. Sturgeon, Brock D. Phillips, Morgan, Morgan, Towery, Morgan & Spector, James E. Towery, Rankin, Oneal, Center, Luckhardt, Marlais, Lund & Hinshaw, David H. Ryan and Edward A. Hinshaw for Real Parties in Interest.

**OPINION**

**BROUSSARD, J.—**

*Facts*

This proceeding arises out of the tragic death of 13-year-old Rudy Ochoa on March 26, 1981. The petitioners (plaintiffs), Raul and Gloria Ochoa, are the surviving parents of Rudy Ochoa. The real parties in interest (defendants) are the County of Santa Clara and four alleged agents and employees of the county.[1] ■ ■■■ The complaint[2] states that on February 19,

---

[1] Contrary to the county's assumption that it was no longer a defendant in this action, plaintiffs sought a writ of mandate directing the trial court to reverse its order sustaining the demurrers of the county as well as the individual defendants.

[2] In testing the sufficiency of a complaint against a demurrer we are guided by the well-settled rule that "a general demurrer admits the truth of all material factual allegations in the complaint [citation]; that the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court [citations]; and that plaintiff need only plead facts showing that he may be entitled to some relief [citation]." (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)

1981, Rudy was admitted to the custody of Santa Clara County juvenile hall. On March 23, 1981, he became ill with an apparent cold. On March 23 and 24, he went to the infirmary for care and treatment. Rudy's parents visited him on March 24. They saw that he was "extremely ill" and was holding his left side in an attempt to relieve severe pain. Rudy told his parents that he felt very sick and that he had been told that he had a "bug." Gloria Ochoa thereafter spoke with juvenile hall authorities and expressed concern that her son was not receiving the necessary treatment. The juvenile hall authorities attempted to reassure her about her son's condition. Both parents experienced extreme mental and emotional distress upon seeing their son's illness and pain and continued to be distressed thereafter.

On March 25, 1981, Rudy was admitted to the juvenile hall infirmary. He was eventually diagnosed as having bilateral pneumonia and had a temperature of 105 degrees. When Mrs. Ochoa visited her son in the infirmary, he was very pale, and looked dehydrated. His skin was clammy and sweaty. He appeared to be going into convulsions and was hallucinating during most of his mother's visit. When he was lucid he complained of feeling very sick and of feeling pain. Mrs. Ochoa was "very distressed and concerned" and requested that she be allowed to take her sick child to her own physician. She told the authorities that she would cooperate in any way necessary so long as Rudy could be seen by the family physician. Mrs. Ochoa was then seen by one of the defendants, Stanley Lourdeaux, M.D., and was told that her son only had the flu and that he should be left in the infirmary. Rudy repeatedly asked his mother to take him to a private doctor. After repeating her requests that her son be seen by the family doctor, Mrs. Ochoa was told that she would have to wait until the following morning to discuss the problem with the probation officer. Dr. Lourdeaux then advised Mrs. Ochoa that her son would be given a penicillin shot.[3]

Mrs. Ochoa then returned to her son's bedside to find him complaining of excruciating pain under his left rib cage. When she attempted to comfort him, his side was tender to touch. She spoke with the nurses on duty and requested that her son be released to her private doctor "even if handcuffed." The nurses denied her request. Mrs. Ochoa gave the nurses her telephone number and asked that she be called immediately if Rudy got worse and told them that she wished to be kept informed of his condition.

After her conversation with the nurses, Mrs. Ochoa returned and began to apply cold compresses in order to bring his fever down. At one point she was told by infirmary personnel to leave. She did not comply with this

---

[3] It is unclear whether the shot was ever given. It was not administered during the time that Mrs. Ochoa was with her son.

request, however, and continued to attend to her child by applying cold water compresses and by attempting to reassure him. Rudy continuously asked her not to leave him. While she was with him, she tried to roll him over on his side. Rudy yelled and screamed, complaining of excruciating pain in his chest area, and asked her to summon the doctor and tell him about the pain. The doctor was called but did not examine Rudy while Mrs. Ochoa was present. Throughout this entire period the child was vomiting and unable to retain any fluids. He was also observed by infirmary personnel coughing up blood.

The authorities again insisted that Mrs. Ochoa leave her son. "[S]he bent down to kiss him and [he] clasped her tightly and pleaded that she [stay] because he was so sick." She attempted to reassure Rudy, telling him that the doctor had assured her he would tend to him. Mrs. Ochoa was then required to leave her son's room. She returned to Dr. Lourdeaux and again pleaded that her son be allowed to be treated by the family physician and removed from the facility for that purpose. During all of this Mrs. Ochoa "experienced extreme mental and emotional distress." She was distressed because of her son's condition and because it appeared that her child's medical needs were being ignored. Mrs. Ochoa never again saw her son alive.

The complaint also alleges that Rudy Ochoa was seen by the attending physician, Dr. Lourdeaux, only once on Tuesday, March 24, 1981, and on only one occasion at approximately 10:30 a.m. on Wednesday, March 25, 1981. After this, no physician examined him until he died at approximately 1:05 a.m. on Thursday, March 26, 1981.

Finally, the complaint alleges that Rudy was never transferred to the intensive care unit of any hospital facility, that no X-rays were taken despite the repeated communications of pain and distress below the rib cage, particularly on the left side, and that no blood or urine tests were performed.

### Procedural History

Plaintiffs' complaint set forth nine causes of action. Defendants demurred and the trial court sustained the demurrers to counts five through nine without leave to amend. Plaintiffs then sought a writ of mandate to compel the court to set aside the order sustaining the defendants' demurrers to the fifth, sixth, eighth and ninth causes of action.[4]

---

[4]Defendants do not claim that the trial court's order may be sustained on the basis of sovereign immunity. (See Gov. Code, § 845.6.)

## I

■ ■ ■ ■ Plaintiffs first contend that they have stated a cause of action for negligent infliction of emotional distress under our decision in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].[5] ■ An examination of *Dillon* and subsequent cases compels the conclusion that plaintiffs have stated a cause of action for negligent infliction of emotional distress.[6]

---

[5]Although plaintiffs assert that they have stated a cause of action for intentional infliction of emotional distress, they have presented no argument on the subject. Plaintiffs appear to assume that a cause of action for intentional infliction of emotional distress may be established on the same theory as that for negligent infliction of emotional distress. The two torts are entirely different. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) § 233 et seq. and § 548 et seq.) The negligence count is discussed in the text. An examination of the requirements for intentional infliction of emotional distress leads to the conclusion that plaintiffs have not alleged facts sufficient to state a cause of action for that tort.

A cause of action for intentional infliction of emotional distress must allege facts showing outrageous conduct which is intentional or reckless and which is outside the bounds of decency. It has been said in summarizing the cases discussing intentional infliction of emotional distress that "the rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is *especially calculated to cause,* and does cause, mental distress of a very serious kind." (Prosser & Keaton on Torts (5th ed. 1984) p. 60, fn. omitted, italics added.) (See, e.g., *Fletcher* v. *Western National Life Insurance Company* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286] [defendant maliciously employed tactics such as making false charges in order to compel the plaintiff to surrender policy or to disadvantageously settle policy]; *Tate* v. *Canonica* (1960) 180 Cal.App.2d 898 [5 Cal.Rptr. 28] [making threats and accusations for the purpose of publicly humiliating the plaintiff].) Here, although defendants conduct did cause the plaintiffs untold distress, it is evident that the defendants acted negligently rather than with the purpose of causing the plaintiffs emotional distress. Further, although the law appears to be moving toward allowing recovery where mental distress is caused when plaintiff witnesses conduct directed toward a third person, "thus far recovery is clearly limited to the most extreme cases of violent attack, where there is some especial likelihood of fright or shock." (Prosser & Keeton, *supra,* at p. 66, fn. omitted.) Plaintiffs have abandoned their eighth cause of action—interference with parental rights.

[6]The complaint reveals that Mr. Ochoa only visited his son once and that he was extremely distressed by what he saw. As we shall explain, such distress is actionable under *Dillon.* Presumably, any further distress suffered by him was not the result of what he saw, but rather the result of what was related to him by his wife after her subsequent visit with their son. Under *Dillon* such distress is not actionable. The discussion in the text focuses on the experiences of Mrs. Ochoa. The analysis, however, is applicable to Mr. Ochoa's cause of action. It has been said that a distinction between distress caused by personal observation of the injury and by hearing of the tragedy from another is justified because compensation should be limited to abnormal life experiences which cause emotional distress. While receiving news that a loved one has been injured or has died may cause emotional distress, it is the type of experience for which in a general way one is prepared, an experience which is common. By contrast few persons are forced to witness the death or injury of a loved one or to suddenly come upon the scene without warning in situations where tortious conduct is involved. In the present case, for example, while it is common to visit a loved one in a hospital and to be distressed by the loved one's pain and suffering, it is highly uncommon to witness the apparent neglect of the patient's immediate medical needs by medical personnel. (See generally, Note, *Limiting Liability for the Negligent Infliction of Emotional Distress: The "Bystander Recovery" Cases* (1981) 54 So.Cal.L.Rev. 847.)

In *Dillon* we became the first American jurisdiction to hold that a parent who witnesses the negligent infliction of death or injury on her child may recover for the resulting emotional trauma and physical injury in cases where the parent does not fear imminent physical harm. In so doing we rejected the "hopeless artificiality" of the rule *requiring that the plaintiff be fearful for his or her own personal safety* in order to recover. The touchstone of our analysis in *Dillon* was foreseeability. "Since the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk, that factor will be of prime concern in every case. Because it is inherently intertwined with foreseeability such duty or obligation must necessarily be adjudicated only upon a case-by-case basis." (68 Cal.2d at p. 740.)

*Dillon* also provided guidelines to aid in ascertaining whether a cause of action was stated in a particular case. "In determining . . . whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

"The evaluation of these factors will indicate the *degree* of the defendant's foreseeability: obviously defendant is more likely to foresee that a mother who observes an accident affecting her child will suffer harm than to foretell that a stranger witness will do so. Similarly, the degree of foreseeability of the third person's injury is far greater in the case of his contemporaneous observance of the accident than that in which he subsequently learns of it. *The defendant is more likely to foresee that shock to the nearby, witnessing mother will cause physical harm* than to anticipate that someone distant from the accident will suffer more than a temporary emotional reaction. All these elements, of course, shade into each other; the fixing of obligation, intimately tied into the facts, depends upon each case." (*Id.,* at pp. 740-741, italics in original.)

There is no question that Mrs. Ochoa has alleged sufficient facts to satisfy the first and last *Dillon* requirements. Plaintiff, the parent of the deceased,

was present while her child suffered apparent injury at the hands of defendants.[7]

The primary issue before us is whether, in order to state a cause of action under *Dillon,* the child's injury must have been the result of a brief and sudden occurrence viewed contemporaneously by the plaintiff. The issue did not arise in *Dillon* because the injury to the child was caused by an automobile accident. Many of the subsequent cases requiring an application of the *Dillon* factors have also involved situations similar to the *Dillon* case where there was a brief, sudden occurrence. (See, e.g., *Hathaway* v. *Superior Court* (1980) 112 Cal.App.3d 728 [169 Cal.Rptr. 435] [electrocution]; *Parsons* v. *Superior Court* (1978) 81 Cal.App.3d 506 [146 Cal.Rptr. 495, 5 A.L.R.4th 826] [car accident]; *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553 [145 Cal.Rptr. 657] [drowning]; *Powers* v. *Sissoev* (1974) 39 Cal.App.3d 865 [114 Cal.Rptr. 868] [car accident]; *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723] [explosion].)

One case, *Jansen* v. *Children's Hospital Medical Center* (1973) 31 Cal.App.3d 22 [106 Cal.Rptr. 883] has required that the child's injury or death be the result of a sudden occurrence. In *Jansen* a mother sought damages for emotional trauma and physical injury caused by witnessing the pain-ridden deterioration and death of her daughter in the hospital. She later learned that her child's death was due to the failure to diagnose a penetrating duodenal ulcer. The *Jansen* court denied recovery, concluding that *Dillon* "contemplates a sudden and brief event causing the child's injury. . . . [T]he event causing injury to the child must itself be one which can be the subject of sensory perception." (*Jansen, supra,* 31 Cal.App.3d at p. 24.) Since the failure to diagnose could not be discerned by a lay person contemporaneously with such failure, the court concluded that extending the *Dillon* rules to cover this situation would yield the potentially limitless liability which *Dillon* sought to avoid. *Jansen* was followed in *Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538 [119 Cal.Rptr. 639]. In *Mobaldi* v. *Regents of University of California* (1976) 55 Cal.App.3d 573 [127 Cal.Rptr. 720], the court interpreted *Jansen* as requiring that "the plaintiff observe an act contemporaneously causing injury. . . . The *Jansen* restriction is related to the reason for the *Dillon* limitation. It recognizes that to avoid 'potentially infinite liability' [citation] *Dillon* draws its limitation in terms of a very close connection in time and geography between the negli-

---

[7]Defendants appear to suggest that *Dillon* only applies when plaintiffs witness the death of their relative. *Dillon,* however, speaks in terms of death or injury. Further, plaintiffs do not contend that they are entitled to recover because of the shock and trauma experienced upon learning of Rudy's death. Rather, liability is posited on the shock and trauma which they experienced upon seeing their son's medical needs being ignored by the defendants.

gent act and resulting injury." (*Id.*, at pp. 584-585; *Parsons* v. *Superior Court, supra,* 81 Cal.App.3d 506, 512.)

We implicitly approved of *Jansen*'s "sudden occurrence" requirement in *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122]. *Justus* involved wrongful death and *Dillon* causes of action by fathers who had been present in the delivery room, and who had experienced distress when the fetuses were delivered still-born. We believed that *Justus* presented a closer case than *Jansen* because "each accident . . . [in *Justus*] was a relatively sudden occurrence." (*Justus* v. *Atchison, supra,* 19 Cal.3d 564, 584.) We nevertheless held that the fathers had failed to state a cause of action under *Dillon* because they had not sustained shock as a result of "'sensory and contemporaneous observance of the accident.'" (*Id.*, at p. 584, quoting *Dillon, supra,* 68 Cal.2d at p. 740.) While *Justus* implicitly approved the sudden occurrence requirement, the case essentially involved a situation where the fathers were unaware of a connection between the defendants' conduct and the injury.

Our review of other cases allowing a cause of action for emotional distress under *Dillon* leads us to the conclusion that the "sudden occurrence" requirement is an unwarranted restriction on the *Dillon* guidelines. Such a restriction arbitrarily limits liability when there is a high degree of foreseeability of shock to the plaintiff and the shock flows from an abnormal event, and, as such, unduly frustrates the goal of compensation—the very purpose which the cause of action was meant to further.

The cases allowing recovery have done so by applying the *Dillon* criteria with some degree of flexibility and for that reason are instructive. In *Krouse* v. *Graham* (1977) 19 Cal.3d 59 [137 Cal.Rptr. 863, 562 P.2d 1022], for example, the plaintiff husband was sitting in his parked car while his wife removed groceries from the trunk. The defendant's car approached plaintiff's car at high speed, killed plaintiff's wife and then struck plaintiff's car. We held that the husband had stated a cause of action under *Dillon* despite the fact that he did not see his wife being struck by defendant's car and did not immediately observe the effect of the collision on her. (*Krouse* v. *Graham, supra,* 19 Cal.3d at pp. 74-75.) We said that "*Dillon* . . . does not require a *visual* perception of the impact causing the death or injury. In the matter before us, although Benjamin did not see Elizabeth struck by defendant's automobile, he fully perceived the fact that she had been so struck, for he knew her position an instant before the impact, observed defendant's vehicle approach her at a high speed on a collision course, and realized that defendant's car must have struck her. Clearly, under such circumstances Benjamin must be deemed a percipient witness to the impact causing Elizabeth's catastrophic injuries." (*Id.* at p. 76, italics in original.)

Similarly in *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253 (which we approved in *Krouse*) the Court of Appeal held that a mother had stated a cause of action under *Dillon* even though she did not actually observe the tortious event. In *Archibald* the mother came upon her child moments after he had been injured in an explosion. The court observed that "the shock of seeing a child severely injured immediately after the tortious event may be just as profound as that experienced in witnessing the accident itself," and that therefore the plaintiff had met the contemporaneous observance require-ment of *Dillon.* (*Archibald* v. *Braverman, supra,* 275 Cal.App.2d at p. 256.)

Using an approach similar to that in *Archibald,* the court in *Nazaroff* v. *Superior Court, supra,* 80 Cal.App.3d 553 held that a mother had stated a cause of action where she arrived on the scene in time to see her missing child being pulled out of a neighbor's pool and to aid in efforts to resuscitate him. He died three days later. After reviewing a number of cases which applied the *Dillon* factors the court concluded: "On balance, and in the light of all of the criteria reviewed above, we must conclude that the record before the court demonstrates that there are triable issues of fact to carry to · the jury as to whether the alleged physical harm to the mother resulted from an emotional shock proximately caused by the direct emotional impact from the *contemporaneous observation of the immediate consequences of the de-fendants' negligent act,* which was the proximate cause of the injury and death of her son. [Citation omitted.] The shout from the pool area may have permitted her to reconstruct the scene, as well as did Mrs. Archibald and Mr. Krouse. Her knowledge of what had occurred was derived from her own senses, and not from another's recital of an uncontemporaneous event." (*Nazaroff* v. *Superior Court, supra,* at pp. 566-567, italics added.)

In *Mobaldi* v. *Regents of University of California, supra,* 55 Cal.App.3d 573, plaintiff brought her foster son to the hospital for tests relating to a congenital kidney defect. Plaintiff held the boy in her arms while doctors injected a glucose and dye solution into his arm intravenously. Unbeknownst to the plaintiff, one of the physicians mistakenly used a "drastically unsafe" dosage of the solution. The doctors then left the room to examine X-rays. While in his foster mother's arms, the child began to breath peculiarly, became spastic, convulsant and finally comatose. *Mobaldi* held that plaintiff satisfied the *Dillon* requirements where she "perceive[d] by sight and hear-ing the physical injury to another in her presence caused by the defendant's negligence, . . ." (55 Cal.App.3d at p. 577.)

Mrs. Ochoa's position in this case is similar to that of the plaintiffs in the above-discussed cases and factually distinguishable from that of the mother in *Jansen.* Here Mrs. Ochoa was aware of and observed conduct by the

defendants which produced injury in her child. She was aware of the fact that her child was in need of immediate medical attention. To her knowledge the defendants had failed to provide the necessary care. As her complaint alleges, she "experienced extreme mental and emotional distress and concern for her son and for [*sic*] the apparent outrageous neglect of medical care while she was present." Like the parents in both *Nazaroff* and *Archibald,* she was able to perceive, and suffered shock, from the connection between defendants' conduct and her child's injury. By contrast, in *Jansen,* the mother's distress stemmed only from the sight of her child's suffering. Any distress she may have suffered as a result of perceiving the impact of defendant's conduct upon her child was the result of "learning of the accident from others after its occurrence." (*Dillon, supra,* 68 Cal.2d at p. 741.) In this regard, the mother's situation in *Jansen* was no different from that of any parent who witnesses the pain and suffering of his or her child due to illness or injury and is unaware that the defendant's conduct is a contributing factor to the continued pain and suffering.

Although *Jansen* may be distinguished from the case before us on the ground that in *Jansen* the plaintiff did not perceive defendant's tortious conduct, we by no means suggest—as did the court in *Hair* v. *County of Monterey, supra,* 45 Cal.App.3d 538, 543-544—that plaintiff must be aware of the tortious nature of defendant's actions. As the court in *Mobaldi* observed, such a requirement would lead to the anomalous result that a mother who viewed her child being struck by a car could not recover because she did not realize that the driver was intoxicated. (*Mobaldi, supra,* 55 Cal.App.3d at p. 583.)

We are satisfied that when there is observation of the defendant's conduct and the child's injury and contemporaneous awareness the defendant's conduct or lack thereof is causing harm to the child, recovery is permitted.

It is important to remember that the factors set forth in *Dillon* were merely guidelines to be used in assessing whether the plaintiff was a foreseeable victim of the defendant's negligence. As we stated in *Dillon:* "We are not now called upon to decide whether, in the absence or reduced weight of some of the above factors, we would conclude that the accident and injury were not reasonably foreseeable and that therefore defendant owed no duty of due care to plaintiff. In future cases the courts will draw lines of demarcation upon facts more subtle than the compelling ones alleged in the complaint before us." (*Dillon, supra,* 68 Cal.2d at p. 741.) It is clear that in the present case defendants had every reason to foresee that Mrs. Ochoa would be distressed by their conduct.

It has been suggested that plaintiffs should not get the benefit of the *Dillon* rule, because they were voluntarily present at a location where distressing

incidents were likely to occur. In *Justus* we implied in dictum that another factor mitigating against the application of the *Dillon* rule to the plight of the fathers present in the delivery room was that they were voluntarily present in a place where it was extremely likely that they would witness distressing events. (19 Cal.3d 564.) Some courts have read this statement to imply that recovery by a plaintiff voluntarily at the scene of a traumatic event may be precluded. (See, e.g., *Cortez* v. *Macias* (1980) 110 Cal.App.3d 640, 650 [167 Cal.Rptr. 905]; *Austin* v. *Regents of University of California* (1979) 89 Cal.App.3d 354, 361 [152 Cal.Rptr. 420], Jefferson, J., dis.)[8] Such a requirement however undercuts the very foundation upon which the *Dillon* case rested. We said in *Dillon* that a tortfeasor could be held liable for damages to a bystander parent because of the foreseeability that the parent of an endangered child would be " 'somewhere in the vicinity.' " (*Dillon, supra,* 68 Cal.2d at p. 730, quoting Prosser, Law of Torts (3d ed. 1964) at p. 353.) A distinction between the involuntary and voluntary presence of the close relative of the injured or dead person thus appears to relieve the defendant of liability for the very risk which should have been foreseen. While in a proper case it may be said that a bystander assumed the risk of traumatic shock, we cannot say that in the ordinary course of events the voluntary or involuntary presence of the plaintiff should be a decisive factor in determining whether plaintiff has stated a *Dillon* cause of action. To the extent that *Justus* makes a contrary suggestion, it is disapproved.

The fear that a less than strict application of the *Dillon* factors will result in "infinite liability" should not prevent courts from allowing plaintiffs to go forward when their shock and trauma stems from their sensory perception of defendant's conduct and their loved one's injury, particularly where, as here, defendants could clearly foresee Mrs. Ochoa's traumatized reaction. In *Dillon* defendant argued that an otherwise meritorious claim should be barred out of a fear that there would be an increase in suits as well as fraudulent claims. We repeat here our response to such a contention: " '[We] should be sorry to adopt a rule which would bar all such claims on grounds of policy alone, and in order to prevent the possible success of unrighteous or groundless actions. Such a course involves the denial of redress in meritorious cases, and it necessarily implies a certain degree of distrust, which [we] do not share, in the capacity of legal tribunals to get at the truth in this class of claim.' " (*Dillon, supra,* 68 Cal.2d at p. 744,

---

[8]Commentators have also noted and criticized the voluntary/involuntary bystander distinction. (See, e.g., Nolan & Ursin, *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos* (1982) 33 Hastings L.J. 583, 597; Twerski, *Seizing the Middle Ground Between Rules and Standards in Design Defect Litigation: Advancing Directed Verdict Practice in the Law of Torts* (1982) 57 N.Y.U. L.Rev. 521, 541.)

quoting *Hambrook* v. *Stokes Bros.* (1925) 1 K.B. 141, quoting *Dulieu* v. *White and Sons* (1901) 2 K.B. 669, 681, opn. by Kennedy, J.)

We therefore conclude that under the facts as alleged, Mrs. Ochoa has stated a cause of action for negligent infliction of emotional distress and that the fifth cause of action should be reinstated.

## II

Plaintiffs also contend that they have stated a cause of action for negligent infliction of emotional distress because they were "direct victims" of defendant's negligence within the meaning of our decision in *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]. In *Molien* this court held that a husband could state a cause of action for negligent infliction of emotional distress where his wife had been negligently misdiagnosed as having syphilis. We rejected plaintiff's contention that although he was not present when the diagnosis was communicated to his wife, he was a "bystander" victim under *Dillon* saying that ". . . the significance of *Dillon* for the present action lies not in its delineation of guidelines fashioned for resolution of the precise issue then before us; rather, we apply its general principle of foreseeability to the facts at hand, much as we have done in other cases presenting complex questions of tort liability. [Citations omitted.]

"In the case at bar the risk of harm to plaintiff was reasonably foreseeable to defendants. It is easily predictable that an erroneous diagnosis of syphilis and its probable source would produce marital discord and resultant emotional distress to a married patient's spouse; Dr. Kilbridge's advice to Mrs. Molien to have her husband examined for the disease confirms that plaintiff was a foreseeable victim of the negligent diagnosis. Because the disease is normally transmitted only by sexual relations, it is rational to anticipate that both husband and wife would experience anxiety, suspicion, and hostility when confronted with what they had every reason to believe was reliable medical evidence of a particularly noxious infidelity.

"We thus agree with plaintiff that the alleged tortious conduct of defendant *was directed to him as well as to his wife.*" (*Molien, supra,* 27 Cal.3d at p. 923, italics added.)

█ Plaintiffs here have not stated a cause of action as direct victims of defendants' negligence. In *Molien* defendant's misdiagnosis was, by its very nature directed at both the wife and the husband. The wife was asked to tell her husband of the diagnosis and the husband was required to submit to tests. By contrast, here the defendants' negligence in the instant case was

directed primarily at the decedent, with Mrs. Ochoa looking on as a helpless bystander as the tragedy of her son's demise unfolded before her. While she was a foreseeable plaintiff to whom the defendants owed a duty of care pursuant to our holding in *Dillon,* the duty owed was owed to her as a percipient witness, not as a direct victim of negligence.

## III

In the sixth cause of action plaintiff Gloria Ochoa incorporates by reference the facts previously set forth and alleges that the "callous and deliberate indifference" of defendants "to the serious medical and physical needs of decedent" violated federal and state constitutional prohibitions against cruel and unusual punishment.[9] ▇ ▇ ▇ ▇ She further alleges that the facts state a cause of action cognizable under 42 United States Code section 1983.[10]

We note initially that the civil rights cause of action has been brought by Gloria Ochoa in her capacity as special administratrix of her deceased son's estate. Although 42 United States Code section 1983 itself is silent on the question whether an action pursuant to its provisions survives the death of the victim of the alleged violations, 42 United States Code section 1988 provides that "in all cases where [the laws of the United States] . . . are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the state wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause. . . ." (42 U.S.C. § 1988.) ▇ This provision has been interpreted to mean that since section 1983 is silent on the question of survival of actions, state law must be referred to in order to make that determination. (See *Robertson* v. *Wegmann* (1978) 436 U.S. 584, 588-590 [56 L.Ed.2d 554, 559-561, 98 S.Ct. 1991].)

---

[9]Both the Eighth Amendment of the federal Constitution and article I, section 17 of the California Constitution prohibit the infliction of cruel and unusual punishment. The Eight Amendment provides: "Excessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishments inflicted." Article I, section 17 provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed."

[10]Section 1983 provides in relevant part: "Every person, who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

California courts exercise concurrent jurisdiction over civil rights actions under section 1983. (See, *Serrano* v. *Unruh* (1982) 32 Cal.3d 621 [186 Cal.Rptr. 754, 652 P.2d 985]; *Williams* v. *Horvath* (1976) 16 Cal.3d 834 [129 Cal.Rptr. 453, 548 P.2d 1125].)

Probate Code section 573 is the principal provision governing survival of actions in this state. Section 573 as amended in 1961 provides in relevant part that ". . . [n]o cause of action shall be lost by reason of the death of any person but may be maintained by or against his executor or administrator." These provisions were meant to apply to "all causes of action heretofore or hereafter arising . . . ." (Deering's Ann. Prob. Code, § 573 (1974 ed.) note at p. 327.) The 1961 amendment was meant to make clear that all claims, including those for injury to the person, survived the death of the victim or wrongdoer. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) §§ 14-15, pp. 2314-2315; *Estate of Hoertkom* (1979) 88 Cal.App.3d 461, 465 [151 Cal.Rptr. 806].) In the present case, the decedent's claim is in the nature of a tort, and under section 573, such a claim survives his death and may be brought by the administrator of his estate. (4 Witkin, *supra,* at p. 2315.)

Turning to the allegations supporting the section 1983 action, we note that the complaint is ambiguous or silent as to the precise custodial status of Rudy Ochoa prior to his death. It is unclear whether he was a "pretrial detainee" or whether he had in fact received the juvenile equivalent of a trial. ██ In general, the protections afforded by the Eighth Amendment do not attach unless the victim has been tried and sentenced for a crime. (See *Ingraham* v. *Wright* (1977) 430 U.S. 651, 671-672, fn. 40 [51 L.Ed.2d 711, 730, 97 S.Ct. 1401].) A distinction has usually been drawn between a pretrial detainee, whom the state lacks the power to punish, and a sentenced offender, whom the state may not punish in a cruel and unusual manner. (See *Bell* v. *Wolfish* (1979) 441 U.S. 520, 535-536 [60 L.Ed.2d 447, 465-466, 99 S.Ct. 1861]; *Loe* v. *Armistead* (4th Cir. 1978) 582 F.2d 1291, 1294.) A detainee awaiting trial is protected by the due process clause of the Fourteenth Amendment, rather than by the Eighth Amendment. (*Ibid.*)

The ambiguity is not fatal in the instant case, however, because "the due process rights of a [detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." (*Revere* v. *Massachusetts General Hospital* (1983) 463 U.S. 239, 244 [77 L.Ed.2d 605, 611, 103 S.Ct. 2979, 2983].) Because we conclude that the facts, as alleged, show that defendants' conduct violated the standards set forth for determining whether the rights of convicted prisoners have been violated, we need not determine in the present action the exact scope of the rights afforded pretrial detainees with respect to medical care.[11] Plaintiff should, however, be given

---

[11]We note, however, that the United States Supreme Court has articulated at least two standards, which may be applicable, governing the state's due process obligation to furnish medical care to individuals in its custody who have not been convicted of any crime. In *Bell* v. *Wolfish, supra,* which involved the conditions of confinement of pretrial detainees, the court stated: "The factors identified in [*Kennedy* v.] *Mendoza-Martinez* [(1963) 372 U.S.

leave to amend, if she so requests, to properly allege the status of her son at the time of his death.

*Estelle* v. *Gamble* (1976) 429 U.S. 97 [50 L.Ed.2d 251, 97 S.Ct. 285] set forth the standards applicable to a claim that the medical needs of a prisoner have been ignored. In that case the United States Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . [citation omitted] proscribed by the Eighth Amendment." (*Estelle* v. *Gamble, supra,* 429 U.S. at p. 104 [50 L.Ed.2d at p. 260].) The court went on to state, however, that not every claim of inadequate medical care rises to the level of cruel and unusual punishment. Specifically, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." (*Id.,* at p. 106 [50 L.Ed.2d at p. 261].)

The court concluded that under the facts there present the prisoner had failed to state a claim for relief. In *Gamble* the prisoner had been injured, had been checked for a hernia and returned to his cell. He experienced pain for which he was given medication and was examined by a doctor. The following day he was again examined by another doctor, was diagnosed as having back strain and received medication for his condition. On other oc-

144 (9 L.Ed.2d 644, 83 S.Ct. 554)] provide useful guideposts. . . . A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. See *Flemming* v. *Nestor* [(1960) 363 U.S. 603] at 613-617 [4 L.Ed.2d 1435, 80 S.Ct. 1367]. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' *Kennedy* v. *Mendoza-Martinez, supra,* 372 U.S. at 168-169, [9 L.Ed.2d 644, 83 S.Ct. 554]; see *Flemming* v. *Nestor, supra,* at 617, [4 L.Ed.2d 1435, 80 S.Ct. 1367]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" (*Bell* v. *Wolfish* [*supra,* 441 U.S. at pp. 538-539 (60 L.Ed.2d at p. 468)], fns. omitted.)

In *Youngberg* v. *Romeo* (1982) 457 U.S. 307 [73 L.Ed.2d 28, 102 S.Ct. 2452], which involved the due process rights of an involuntarily committed mentally retarded person, the court first noted that the standard articulated in *Estelle* v. *Gamble* [(1976) 426 U.S. 97 (50 L.Ed.2d 251, 97 S.Ct. 285)] for denial of medical care of convicted persons had been erroneously applied by the lower court. (*Youngberg* v. *Romeo, supra,* 457 U.S. 307, 312, fn. 11 [73 L.Ed.2d 28, 35].) The court concluded that the involuntarily committed person had a right to adequate food, shelter, clothing, and medical care and also to safe conditions, freedom from bodily restraint and minimally adequate care or reasonable training to ensure safety and freedom from undue restraint. Liability would be imposed "when the decision by the professional [regarding care of the committed person] is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." (*Youngberg* v. *Romeo, supra,* at p. 323 [73 L.Ed.2d at p. 42], fn. omitted.) Under either standard, the facts as alleged would constitute a cause of action under section 1983.

casions he received treatment and was seen by doctors when he complained of pain. The court concluded that it was quite apparent that the plaintiff had "received extensive medical care and that the doctors were not indifferent to his needs." (*Id.*, at p. 108, fn. 16 [50 L.Ed.2d at p. 262].)

Defendants do not dispute that Rudy Ochoa was suffering from a "serious medical need." Rather, they contend that defendants' conduct did not rise to the level of "deliberate indifference" contemplated by the court in *Gamble*. Pointing to the fact that Rudy was seen by doctors on at least two occasions and that he received a diagnosis, was placed in the infirmary and that penicillin was prescribed for him, defendants assert that plaintiffs are merely alleging negligence. Defendants rely on a group of cases which have denied relief to prisoners where allegations or evidence suggests that under the circumstances the treatment received was adequate, or if not adequate merely negligent.[12]

It has been recognized, however that inadequate medical treatment may, in some instances, constitute a violation of 42 United States Code section 1983. (*Westlake* v. *Lucas* (6th Cir. 1976) 537 F.2d 857, 860-861, fn. 5.) In *Sturtz* v. *City of Philadelphia* (E.D.Pa. 1982) 529 F.Supp. 434, for example, the plaintiff alleged that defendants acted "carelessly, recklessly and negligently" when they failed to remove sutures from his eye, neck and face. The court concluded that although plaintiff was alleging inadequate medical treatment, he had stated a cause of action under section 1983: ". . . where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments. *Pinon* v. *Wisconsin*, 368 F.Supp. 608,

---

[12]The cases relied upon by defendant are all clearly distinguishable from the instant case. In *Hamilton* v. *Roth* (3d Cir. 1980) 624 F.2d 1204 for example, the defendant doctor was unaware that the consultation he had ordered for plaintiff's condition had never been arranged by prison officials. Upon learning of the delay the doctor immediately arranged for the consultation. Other cases have involved prisoners who did not cooperate in the prescribed course of treatment. (See, e.g., *Bourgeois* v. *Hongisto* (S.D.N.Y. 1980) 488 F.Supp. 304; *Layne* v. *Vinzant* (1st Cir. 1981) 657 F.2d 468.) In other cases the court examined the course of treatment given by medical personnel and found that it did not in any way deviate from standard treatment or was adequate given the nature of plaintiff's condition. (See, *Bass* v. *Sullivan* (5th Cir. 1977) 550 F.2d 229; *Alexander* v. *Robinson* (E.D.Pa. 1979) 463 F.Supp. 1232; *May* v. *Enomoto* (9th Cir. 1980) 633 F.2d 164; *Freeman* v. *Lockhart* (8th Cir. 1977) 561 F.2d 728; *Brown* v. *Beck* (S.D.Ga. 1980) 481 F.Supp. 723.) In other cases there was a lack of evidence suggesting a serious or urgent medical need. (See, e.g., *Sowell* v. *Israel* (E.D.Wis. 1980) 500 F.Supp. 209; *Brown* v. *McGowan* (D.Colo. 1978) 445 F.Supp. 468; *Hancock* v. *Unknown United States Marshall* (8th Cir. 1978) 587 F.2d 377.) In one case even though the doctor had made an incorrect diagnosis he did so after a period of time and the court was not convinced that the doctor's examination was merely cursory (see *Wester* v. *Jones* (4th Cir. 1977) 554 F.2d 1285). Finally, *Campbell* v. *Sacred Heart Hospital* (E.D.Pa. 1980) 496 F.Supp. 692 involved the failure to diagnose a very rare disease where the defendants had made more than a cursory attempt to do so and where the plaintiff had exhibited no alarming symptoms.

610 (E.D.Wis. 1973). See also *Fitzke* v. *Shappell,* 468 F.2d 1072, 1076 (6th Cir. 1972). In some cases, however, the medical attention rendered may be so woefully inadequate as to amount to no treatment at all, thereby rising to the level of a § 1983 claim. *Westlake,* 537 F.2d at p. 860, n. 5; *Tolbert* v. *Eyman,* 434 F.2d 625, 626 (9th Cir. 1970); *Riley* v. *Rhay,* 407 F.2d 496 (9th Cir. 1969); *Stilner* v. *Rhay,* 371 F.2d 420, 421 n. 3 (9th Cir.), cert. denied, 386 U.S. 997, 87 S.Ct. 1318, 18 L.Ed.2d 346 (1967). In this case, . . . plaintiff has adequately pleaded a set of facts which may evidence a deliberate indifference to serious medical needs which may entitle him to § 1983 relief." (*Id.,* at p. 438.)

Other cases have similarly recognized that "woefully inadequate" medical care may result in the infliction of cruel and unusual punishment. (See, e.g., *Scitarelli* v. *Manson* (D.Conn. 1978) 447 F.Supp. 279; *Layne* v. *Vinzant* (1st Cir. 1981) 657 F.2d 468, 474; *Laaman* v. *Helgemoe* (D.N.H. 1977) 437 F.Supp. 269.)

█ Accepting as we must, the truth of the allegations in the complaint, there is no question that the treatment received by Rudy Ochoa under the circumstances was "woefully inadequate." Mrs. Ochoa brought her son's symptoms to the attention of the defendants when she visited with him on March 24. When she visited him a second time Rudy was exhibiting alarming symptoms, including a soaring temperature, dehydration, vomiting, hallucinations, the beginnings of convulsions and severe pain on his left side. He was also observed vomiting blood. These conditions indicated, even to a layperson, that emergency measures were needed. Significantly, it was left to Mrs. Ochoa to make use of the facilities in order to care for her son. Although penicillin was prescribed, it is unclear that any was ever administered. Mrs. Ochoa's requests for treatment for her son were met only with the observation that he had a "bug." It is also alleged that no radiological, blood or urine tests were undertaken in order to diagnose Rudy's condition.

Given the severity of the symptoms exhibited by the decedent as well as the lack of response by the defendants to his medical needs we conclude that Mrs. Ochoa has pleaded facts sufficient to state a cause of action under 42 United States Code section 1983.

Let a peremptory writ of mandate issue commanding the Superior Court of Santa Clara County to vacate its order in this action and to enter a new order consistent with the views expressed in this opinion.

Mosk, J., Kaus, J., Reynoso, J., and Girard, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.

**GRODIN, J.**—I agree with the majority that the facts which plaintiffs have alleged are sufficient to state a cause of action for negligent infliction of emotional distress under the theory of *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. That being so, the "alternative" theory which plaintiffs have advanced—that they were "direct victims" of defendant's negligence within the meaning of *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]—appears in this case to be redundant. The majority opinion is therefore entirely adequate to the decision of this cause and I concur in the judgment.

I agree also with the Chief Justice that there remain after today's opinion numerous questions concerning the application of the *Dillon* guidelines which have proved troublesome to the lower courts and which this court must, sooner or later, confront and resolve. As a means of focusing needed attention upon those policy considerations which ought to guide the development of the law in this area I take the opportunity to add a few thoughts of my own.

As regards physical injury, apart from problems pertaining to the determination of duty in certain classes of cases (see, e.g., *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112-113 [70 Cal.Rptr. 97, 443 P.2d 561]), recovery is normally allowed under a showing of negligence, foreseeability, and proximate cause; and each of these elements is said to be a question for the jury. (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]; see also Prosser & Keaton, Torts (5th ed. 1984) § 37, pp. 235-238.) If precisely the same rules were applied to emotional distress, then in principle any person who claims to have suffered such injury as a result of another's negligent act would be entitled to present his case to a jury whenever the record reflects triable issues of fact with respect to the requisite elements of the tort. Moreover, as a matter of logical analysis this would be true whether or not the evidence comported with the criteria enunciated in *Dillon,* since at most those criteria would serve as guidelines for the jury's determination of foreseeability as a question of fact.

Perhaps such a rule would be desirable. It must be recognized, however, that it is not the rule which *Dillon* established. After observing that the principle of foreseeability serves "to limit the otherwise potentially infinite liability which would follow every negligent act" (68 Cal.2d at p. 739), Justice Tobriner's opinion proceeds to suggest factors which "the courts will take into account" in determining "whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care." (*Id.,* at p. 740, see also p. 741 ["[i]n light of these factors the court will determine whether the accident

and harm was *reasonably* foreseeable"]; p. 742 ["[t]he courts have in the past, in analogous situations, drawn the limits of liability, applying general guidelines such as those above set forth to the specific facts of the cases"].)

Thus, however, flexible the *Dillon* guidelines were intended to be, it is clear that they were to be applied in the first instance by the *courts* as a means of guarding against unwarranted extensions of liability. The principle of *foreseeability,* normally a question for the jury, became fused in this analysis with the concept of *duty,* which serves normally as a vehicle for limiting liability on the basis of policy considerations which are thought to outweigh the policy of compensating victims of negligent conduct. (Diamond, *Dillon v. Legg Revisited: Toward a Unified Theory of Compensating Bystanders and Relatives for Intangible Injuries* (1984) 35 Hastings L.J. 477 [hereafter *Dillon v. Legg Revisited*].)

This fusion has given rise to a degree of *con*fusion, and a perception of "arbitrariness," in the application of the *Dillon* guidelines. Professor Diamond, for example, argues that of the three *Dillon* criteria, only one (a close relationship between the victim and the bystander plaintiff) is clearly relevant to a foreseeability analysis (*Dillon v. Legg Revisited, supra,* 35 Hastings L.J. at p. 488), and that the "mechanical application" of the guidelines "has led to the erection of arbitrary limitations on recovery bearing little relation to the principles of foreseeability espoused so forcefully in *Dillon.*" (*Id.,* at p. 478.) The Chief Justice's separate opinion in this case provides numerous illustrations of this thesis.

One solution to this dilemma, obviously, is to abandon any limitations upon recovery for emotional injury that are not also imposed upon physical injury. This appears to be the approach of the House of Lords in *McLoughlin* v. *O'Brian* (1982) 2 All Eng.Rep. 298.[1] The parallel is not precise since in Britain personal injury cases are normally tried without a jury (see *Ward* v. *James* (1966) 1 Q.B. 273, 280) so that it is the court which determines whether the elements of recovery are present. In application, therefore, the English rule is similar to that which would exist if we were to recognize negligent infliction of emotional distress as a generic tort with the element of foreseeability determined by the court rather than by the jury.

A second approach, that advocated by the Chief Justice, calls for extending the principle of *Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916, so as to allow recovery for the negligent infliction of mental distress whether the plaintiff is a "direct" or "indirect" victim, but to insist

---

[1] The high court of Australia has arrived at a similar result in *Jaensch* v. *Coffey* (1984) 54 Austl. Argus L.R. 417.

that the injury meet some threshold of "seriousness." The function of this requirement, presumably, would be to protect against "fraud, trivial claims, and unlimited liability." (Nolan & Ursin, *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos* (1982) 33 Hastings L.J. 583, 620.) One commentator, observing that even "serious" emotional injury is a normal and inevitable part of existence, suggests "limiting recovery to cases of emotional distress that most people *do not face with sufficient frequency or sufficient certainty* to anticipate, to prepare for, and thus to absorb without suffering severe or permanent emotional damage." (Note, *Limiting Liability for the Negligent Infliction of Emotional Distress: The "Bystander Recovery" Cases* (1981) 54 So.Cal.L.Rev. 847, 868.) This is similar to the formulation in *Molien:* whether "a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." (27 Cal.3d at p. 938, citing *Rodrigues* v. *State* (1970) 52 Hawaii 156, 173 [472 P.2d 509, 520].)[2]

Two academic commentators have suggested what might be termed a more radical solution. Professor Richard Miller argues that it is possible for the judicial process to produce an approach to recovery for mental-distress-without-impact that will satisfy the competing concerns of justice and policy "only if the courts are willing to couple the application of ordinary negligence principles for determining the issue of liability with a significant reduction in the damages available if liability is imposed." (Miller, *The Scope of Liability for Negligent Infliction of Emotional Distress: Making "The Punishment Fit The Crime"* (1979) 1 Hawaii L.Rev. 1, 3.) Eschewing a case-by-case approach, Professor Miller advocates application of general tort principles with a limitation of recovery in mental-distress cases to tangible economic loss in the form of medical care and disability. (*Id.,* at pp. 39-40.) Professor Diamond, pointing to this court's opinion in *Turpin* v. *Sortini* (1982) 31 Cal.3d 220 [182 Cal.Rptr. 337, 643 P.2d 954] to illustrate the appropriateness of such judicially imposed limitations upon recovery, advocates extending Professor Miller's thesis to include loss of consortium and parent-and-child society claims as well. (*Dillon v. Legg Revisited, supra,* 35 Hastings L.J. at pp. 479-480.)

Finally, it has been suggested that while any court-imposed limitation upon the category of plaintiffs who may recover for negligently inflicted emotional distress can be attacked as "arbitrary," the result is more acceptable in terms of public policy than not to have any limitations at all. (Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm—*

---

[2]Professors Nolan and Ursin take issue with the *Molien* formulation insofar as it suggests that the "thin skull plaintiff" rule, applicable to physical injury, should be abandoned when it comes to emotional injury. (Nolan & Ursin, *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos, supra,* 33 Hastings L.J. at p. 616, fn. 188.)

*A Comment on the Nature of Arbitrary Rules* (1982) 34 U.Fla. L.Rev. 477.) Though Professor Pearson relies upon his analysis to urge a return to the "zone of danger" test which *Dillon* rejected, a similar argument might be made in support of continued reliance upon *Dillon* guidelines, with or without modification.

This case does not require us to choose among these alternatives, and I do not do so now. What seems to me important to recognize is that the choice inevitably involves difficult questions of public policy, including a determination as to whether the nature of emotional injury requires any limitations upon recovery that are not imposed also upon physical injury and, if so, precisely what those limitations ought to be. Absent legislative guidance, courts cannot avoid making such policy decisions, and in the process of making them we are likely to benefit from all the assistance, in the form of analysis and empirical evidence, that the parties can provide.

**BIRD, C. J.,** Concurring and Dissenting.—

I.

Seventeen years ago in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], California became the first American jurisdiction to hold that a mother could recover for the emotional distress she experienced when she witnessed the negligent infliction of death or injury to her child even though she was not within the physical zone of danger. (See Nolan & Ursin, *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos* (1982) 33 Hastings L.J. 583.) The *Dillon* court rejected the "hopeless artificiality" of the zone-of-danger rule (68 Cal.2d at p. 733) and emphasized the primary importance of foreseeability in establishing liability.[1] (*Id.,* at pp. 739-740.)

However, the court cautioned that since duty is inherently intertwined with foreseeability, this issue "must necessarily be adjudicated only upon a case-by-case basis. We cannot now predetermine defendant's obligation in every situation by a fixed category; *no immutable rule* can establish the extent of that obligation for every circumstance of the future." (68 Cal.2d at p. 740, italics added.)

*Dillon* set forth certain guidelines for determining the foreseeability question: "(1) Whether plaintiff was located near the scene of the accident as

---

[1] *Dillon* embraced the concepts of negligence, proximate cause and foreseeability, but condemned "artificial abstractions" which bar recovery contrary to the general rules. Also, it recognized that " 'mechanical rules of thumb which are at variance with these principles do more harm than good.' [Citation.]" (68 Cal.2d at pp. 746-747.)

contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (68 Cal.2d at pp. 740-741.)

What has followed in *Dillon*'s wake is confusion rather than clarity. The *Dillon* guidelines have been strictly and mechanically applied. This has led to arbitrary, inconsistent and inequitable results antithetical to principles enunciated in *Dillon*.

A review of the cases is illustrative. First, consider the Court of Appeal decisions which have strictly construed the second *Dillon* guideline. In *Hathaway* v. *Superior Court* (1980) 112 Cal.App.3d 728 [169 Cal.Rptr. 435], a six-year-old boy was electrocuted by touching an evaporative cooler while playing outside. His mother and father, who were inside the house, came out after their son's playmate told them something was wrong with their child. They rushed outside to see him lying in a puddle of water by the cooler in a "dying state," gagging and spitting up. Efforts to revive him failed. (*Id.*, at pp. 730-731.)

The Court of Appeal held that the parents did not state a cause of action under *Dillon* because they did not satisfy the second "requirement." (112 Cal.App.3d at p. 734.) The parents "did not sensorily perceive the injury-causing event, that is, the actual contact between the electrically charged water cooler and [their child], but saw only the results of the contact (the injuries) after the accident was over." (*Id.*, at p. 736.) The court was confident that its strict application of the second *Dillon* "requirement" followed a "steady flow of Court of Appeal cases." (*Id.*, at p. 734.)

*Parsons* v. *Superior Court* (1978) 81 Cal.App.3d 506 [146 Cal.Rptr. 495, 5 A.L.R.4th 826] is one example in that "flow." There, the plaintiffs, who had been following a car in which their two daughters were passengers, came upon the wreckage of the car. They realized instantly that their daughters were either dead or dying. The father left his car and reached the wreckage "before the dust had settled." (*Id.*, at pp. 508-509.) Nevertheless, the Court of Appeal held that since the parents did not see, hear or otherwise sensorily perceive the injury-producing event, the second *Dillon* "requirement" had not been met. (*Id.*, at p. 512.)[2]

---

[2]See also *Ebarb* v. *Woodbridge Park Assn.* (1985) 164 Cal.App.3d 781 [210 Cal.Rptr. 751] (recovery denied to sister who observed brother's body floating in a spa 20 minutes

These cases are hard to reconcile with other Court of Appeal decisions which have taken a more flexible view. For example, in *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553 [145 Cal.Rptr. 657], the mother of a three-year-old boy sought recovery after witnessing her son being pulled from a swimming pool. The mother had been looking for her son when she heard a neighbor scream, "It's Danny." She ran to the pool and saw a neighbor pull Danny out and give him mouth-to-mouth resuscitation. Three days later, the boy died. (*Id.*, at pp. 557, 559.)

Even though the mother arrived on the scene after the accident, the Court of Appeal permitted recovery. Observing that *Dillon* "creat[ed] [not] parameters but merely guidelines" (80 Cal.App.3d at p. 562), *Nazaroff* characterized the issue as whether emotional distress had resulted from the "contemporaneous observation of the immediate consequences of the defendants' negligent act," and concluded that there were triable issues of fact for the jury. (*Id.*, at p. 566.)

Similarly, in *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723], the plaintiff's 13-year-old son sustained severe injuries as the result of a gunpowder explosion. Within moments of the actual explosion, the mother appeared at the scene in an effort to render aid. When she saw his injuries, she suffered severe fright, shock and mental illness.

The Court of Appeal reversed a summary judgment for the defendants, concluding that all three *Dillon* factors had been satisfied. (275 Cal.App.2d at p. 256.) As to the second factor, the court noted that "[a] plaintiff claiming damages for emotional trauma as a result of injury to a third party must either be present at the time of the accident [citation] or the shock sustained by the plaintiff must be *fairly contemporaneous with the accident rather than follow when the plaintiff is informed of the whole matter at a later date.* [Citation.] Manifestly, the shock of seeing a child severely injured immediately after the tortious event may be just as profound as that experienced in witnessing the accident itself. Consequently, the shock sustained by the mother herein was 'contemporaneous' with the explosion . . . ." (*Ibid.*, italics added.)

after he drowned when his arm became encased in drain at bottom of spa); *Madigan* v. *City of Santa Ana* (1983) 145 Cal.App.3d 607 [193 Cal.Rptr. 593] (recovery denied to parent and stepparent who arrived at scene within 15 minutes after collision killing their son); *Arauz* v. *Gerhardt* (1977) 68 Cal.App.3d 937 [137 Cal.Rptr. 619] (recovery denied to mother who arrived at scene within 5 minutes after collision injuring her son); *Powers* v. *Sissoev* (1974) 39 Cal.App.3d 865 [114 Cal.Rptr. 868] (recovery denied to mother who saw injured 5½-year-old daughter 30 to 60 minutes after the accident); *Deboe* v. *Horn* (1971) 16 Cal.App.3d 221 [94 Cal.Rptr. 77] (recovery denied to wife summoned to emergency room where she observed totally paralyzed husband).

There is no principled way to reconcile these cases. Why should the parents in *Hathaway* and *Parsons,* who arrived on the scene moments after the crucial event, have been denied recovery, when the parents in *Nazaroff* and *Archibald,* who also arrived moments after the accident, have been permitted recovery? Was the emotional distress suffered by the parents in the former cases any less reasonably foreseeable than the emotional distress suffered by the parents in the latter cases? The arbitrary distinctions drawn in cases such as *Hathaway* and *Parsons* lead to inequitable and unjust results.

Other inconsistent results are caused by this rigid, narrow construction of the second *Dillon* guideline. For example, compare *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122] with *Austin* v. *Regents of University of California* (1979) 89 Cal.App.3d 354 [152 Cal.Rptr. 420]. Both cases involved plaintiff-fathers who were present in the delivery room when their children died during birth due to the defendants' alleged negligence. In *Justus,* the court denied recovery since the father's shock occurred *after* the doctor informed him that the baby had just died. (19 Cal.3d at p. 585.) However, in *Austin,* the court permitted recovery since the father "learned of the death by his own observation . . . ." (89 Cal.App.3d at p. 358.) Surely, these results are irreconcilable.[3]

Cases addressing the third *Dillon* factor—"[w]hether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship" (68 Cal.2d at p. 741)—further illustrate the morass that has developed. *Dillon* spoke only in terms of a close relationship, yet lower courts have read in a close *blood or marriage* relationship as a threshold requirement for recovery. Again, arbitrary distinctions, inequities and inconsistencies are the result of these mechanical applications.

---

[3]Also illustrative is *Johnson* v. *Superior Court* (1981) 123 Cal.App.3d 1002 [177 Cal.Rptr. 63]. There, a mother suffered emotional distress resulting from a medically caused stillbirth. The court initially attempted to apply the *Dillon* guidelines, but finally recognized "the difficulty of fitting a medically caused stillbirth neatly into the *Dillon* mold." (*Id.,* at p. 1007.) In recognizing a cause of action, the court concluded that "[i]t is nonetheless patently clear that a mother forms a sufficiently close relationship with her fetus during pregnancy so that its stillbirth will foreseeably cause her severe emotional distress. . . . The solution to the problem lies not in contorting *Dillon* to cover a situation which it was not designated to fit, but in recognizing that the emotional distress arising from the sensory impact of the death of the child is compensable as part of the mother's cause of action for malpractice to herself." (*Ibid.*) A more liberal reading of *Dillon* and a focus on the reasonable foreseeability of the serious emotional distress would have prevented such a strained analysis. (See *post,* at pp. 190-191.)

Negligent misdiagnosis and treatment cases are in their own state of disarray. (Compare *Mobaldi* v. *Regents of University of California* (1976) 55 Cal.App.3d 573 [127 Cal.Rptr. 720], with *Jansen* v. *Children's Hospital Medical Center* (1973) 31 Cal.App.3d 22 [106 Cal.Rptr. 883] and *Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538 [119 Cal.Rptr. 639].)

*Drew* v. *Drake* (1980) 110 Cal.App.3d 555 [168 Cal.Rptr. 65] is another illustration. There, the plaintiff sustained emotional distress when she witnessed an automobile collision involving her "de facto spouse" with whom she had lived continuously for three years. Construing the third *Dillon* guideline to require a "family relationship" between the plaintiff and the decedent, the Court of Appeal observed, "[t]o allow persons standing in a 'meaningful relationship' (to use a contemporary colloquialism) to recover for emotional distress resulting in physical injury would abandon the *Dillon* requirement that '[t]he courts . . . mark out the areas of liability, excluding the remote and unexpected.' . . ." (*Id.*, at pp. 557-558.)

In a sharply worded dissent, Justice Poché chastised the majority for drawing a "bright line distinction" between those persons formally married and those not and for rewriting the third *Dillon* guideline "to require a formal marriage relationship." (110 Cal.App.3d at p. 558.) "We are told that unchurched . . . relationships cannot be close and that the tortfeasor could not foresee that his victim would have a close relationship with a person to whom she was not formally married. . . . [¶] I do not believe that this no marriage-no recovery rule is what the California Supreme Court meant when it ordered the courts of this state to carefully analyze on a case-by-case basis what the ordinary person should have foreseen." (*Id.*, at pp. 558-559.)[4]

*Trapp* v. *Schuyler Construction* (1983) 149 Cal.App.3d 1140 [197 Cal.Rptr. 411] further illustrates how the courts have narrowly construed this guideline. The plaintiffs were two children who witnessed the drowning of their first cousin and constant playmate in a swimming pool negligently maintained by the defendant. Despite the presence of a relationship analogous to that between siblings, the Court of Appeal held that a close relationship "does not include friends, housemates, or those standing in a 'meaningful relationship.' " (*Id.*, at p. 1142.)

The Court of Appeal for the Fifth District recently concluded that the third *Dillon* guideline requires a strict construction. (*Kately* v. *Wilkinson* (1983) 148 Cal.App.3d 576 [195 Cal.Rptr. 902].) There, a mother, Kately, her 14-year-old daughter, Rebecca, and the daughter's best friend, Rhonda, described as a "filial member" of the family, were involved in a water skiing accident. Kately was the owner and operator of the boat. While Rhon-

---

[4]A recent Court of Appeal decision has reached a result contrary to the *Drew* majority. In *Ledger* v. *Tippitt* (1985) 164 Cal.App.3d 625 [210 Cal.Rptr. 814], the court concluded that an unmarried cohabitant could sue for emotional distress suffered from witnessing the stabbing death of her lover. The court noted that " '[t]he law should find more than pity for one who is stricken by seeing that a loved one has been critically injured or killed.' [Citation.]" (*Id.*, at p. 647.)

da was water skiing, the boat's steering wheel locked because of an alleged defect. While Rebecca looked on, the boat collided with Rhonda, causing severe injuries. Rhonda, who was still alive, was pulled back into the boat. However, "because of the locked steering column, Kately was unable to operate the boat. Kately and Rebecca were compelled to sit with Rhonda in her badly mutilated condition as the boat circled in the water. Rhonda died as a result of her injuries." (*Id.*, at p. 580.) Witnessing these fatal injuries, Kately and Rebecca suffered emotional stress.

The Court of Appeal concluded that Kately's and Rebecca's relationship with Rhonda was "not a family relationship but one akin to a family relationship because of friendship and past associations . . . ." (*Kately, supra,* 148 Cal.App.3d at p. 579.) Although aware of several out-of-state cases which suggested a more liberal construction of the third *Dillon* guideline, the court observed that the California courts "which have been called upon to construe the *Dillon* guidelines as they relate to foreseeability, when the satisfaction of one or more of them was less than absolute, have construed them strictly." (*Id.*, at p. 584.)[5]

As these cases so aptly illustrate, confusion and inconsistency are the result of a strict construction of the *Dillon* guidelines. The courts have woven a web of arbitrary rules having little or no relation to the reasonable foreseeability of a plaintiff's emotional distress.

However, this deplorable state of the law does not stop with *Dillon* and its progeny. This court's decision in *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] added another layer of confusion upon an already "analytically complex regime of arbitrary rules restricting recovery for foreseeable emotional distress" (Nolan & Ursin, *supra,* 33 Hastings L.J. at p. 587).

In *Molien,* this court permitted a husband to recover for emotional distress resulting from the misdiagnosis of his wife for syphilis. Faced with a factual situation which did not fit neatly into the *Dillon* mold, *Molien* recognized that *Dillon*'s general foreseeability principles controlled and reaffirmed that foreseeability was the "critical inquiry" in determining a defendant's liability. (27 Cal.3d at pp. 922-923.)

Since the plaintiff-husband was not a bystander, the *Dillon* guidelines were not applicable. However, *Molien* permitted recovery since the risk of harm to the husband was "reasonably foreseeable." The court characterized the husband as a "direct victim." (*Id.*, at p. 923.)

---

[5]The Court of Appeal permitted recovery on another theory. (See *post,* at p. 188.)

As several commentators and courts have observed, this "direct victim" test is nothing more than reasonable foreseeability in disguise. (See, e.g., *Andalon* v. *Superior Court* (1984) 162 Cal.App.3d 600, 609 [208 Cal.Rptr. 899]; *Wiggins* v. *Royale Convalescent Hospital* (1984) 158 Cal.App.3d 914, 922-923 [206 Cal.Rptr. 2] (dis. opn. of Sonenshine, J.); *Accounts Adjustment Bureau* v. *Cooperman* (1984) 158 Cal.App.3d 844, 848-849 [204 Cal.Rptr. 881]; Nolan & Ursin, *supra,* 33 Hastings L.J. at p. 603; Note, *Negligent Infliction of Emotional Distress: New Horizons After Molien v. Kaiser Foundation Hospitals* (1981) 13 Pacific L.J. 179, 189.)

Yet that test, too, has spawned confusion. For example, in *Andalon* v. *Superior Court, supra,* 162 Cal.App.3d 600, the Court of Appeal permitted the parents of a child born with Down's Syndrome to recover for emotional distress resulting from the alleged negligent prenatal care to the mother. The court concluded that both parents were "direct victims," since the mother was a party to the contract with the defendant-doctor and the father was a "direct beneficiary of [the] tort-duty imposed by virtue of the doctor-patient relationship." (*Id.,* at p. 611.)

In *Accounts Adjustment Bureau* v. *Cooperman, supra,* 158 Cal.App.3d 844, the Court of Appeal permitted the parents of a two-year-old child to maintain an action against a psychologist for emotional distress allegedly caused by the defendant's misdiagnosis of their child. Relying on *Molien,* the court held that "[i]t would be pure fiction to believe that a negligent diagnosis of a two-year-old could not foreseeably cause parents serious emotional distress. A two-year-old has no one but parents to be distressed. Parents having sole responsibility for their child can be direct victims of their child's misdiagnosis." (*Id.,* at pp. 848-849.)

A similar expansive reading of *Molien*'s direct victim analysis occurred in *Sesma* v. *Cueto* (1982) 129 Cal.App.3d 108 [181 Cal.Rptr. 12]. There, a mother and father suffered emotional distress as a result of alleged medical negligence resulting in the stillbirth of their child. The court permitted the mother to go to trial as a direct victim since the mother's "emotional distress could have been personally and directly sustained in her own right, as contrasted to injury sustained in her 'bystander' capacity as a prospective mother distressed at injury inflicted upon her unborn fetus." (*Id.,* at p. 115, fn. omitted.) The court further held that *Molien* "supports the conclusion that . . . the father [] may be able to show that he is a 'direct victim'—if not percipient witness—of negligent acts giving rise to infliction of serious emotional distress." (*Id.,* at p. 116.)

However, in *Cortez* v. *Macias* (1980) 110 Cal.App.3d 640 [167 Cal.Rptr. 905], the Court of Appeal strictly construed *Molien*'s direct victim require-

ment. There, a mother sued for negligent infliction of emotional distress caused by the negligent diagnosis and treatment of her infant son. The court recognized that "[t]he language in *Molien* is sufficiently broad . . . to permit similar reasoning to be applied to the facts of the case before us." (*Id.*, at p. 649.) Nevertheless, the court applied the *Dillon* guidelines and denied recovery because the mother's shock did not result from a contemporaneous observance of the negligent conduct but from the news of her child's death moments later. (*Id.*, at p. 650.)[6]

*Wiggins* v. *Royale Convalescent Hospital, supra,* 158 Cal.App.3d 914 also illustrates a strict construction of *Molien*'s direct victim limitation. There, the court denied recovery to a wife who sued a hospital for emotional distress arising from the negligent care of her husband who was seriously hurt when he fell from his hospital bed because of the defendant's failure to raise the bed's safety rails. The court was not persuaded that the case fell within the ambit of *Molien,* concluding that the wife was not a direct victim since her emotional distress derived solely from her husband's injuries. (*Id.*, at pp. 917-918.)

In a persuasive dissent, Justice Sonenshine concluded that the wife was a direct victim under *Molien.* (158 Cal.App.3d at p. 923.) "It is easily predictable that negligent care of one's elderly and infirm spouse would produce emotional distress. This is particularly true in the context of this case. Wife herself is elderly and was unable to personally fulfill her spousal obligations of comfort and care. She thus entrusted her husband's care to defendants. Any negligent abuse of that responsibility would have a *direct* effect on her." (*Ibid.*)

In *Kately* v. *Wilkinson, supra,* 148 Cal.App.3d 576, the Court of Appeal applied a flexible direct victim analysis. Although *Dillon* would not permit recovery (see *ante,* at p. 185), the court held that under *Molien,* mother and daughter were direct victims. (148 Cal.App.3d at pp. 587-589.) The manufacturer and seller of the boat "should reasonably have foreseen that Kately, as the purchaser and an operator of the defective boat, would suffer emotional distress when the boat malfunctioned and killed or injured another human being." (*Id.*, at pp. 587-588.) "The user of a defective product is not a mere bystander but a primary and direct victim of the product defect

---

[6]One commentator has observed that "[w]ithin months after the *Molien* decision, California appellate courts began struggling to apply the 'standards and guidelines' of that case to the facts of their respective cases. Despite the supreme court's reminder in *Molien* to determine liability on a case-by-case basis, lower courts have already reverted to strict adherence to the *Dillon* standards." (Note, *Molien v. Kaiser Foundation Hospitals: California's New Tort of Negligent Infliction of Serious Emotional Distress* (1982) 18 Cal. Western L.Rev. 101, 118, fn. omitted.)

. . . ." (*Id.,* at p. 588.) Moreover, in view of a statute which required that the skier be under constant surveillance, the court held that "it was foreseeable that [the daughter] would suffer emotional distress from witnessing injury to the skier for whom she was the responsible observer . . . ." (*Id.,* at pp. 588-589.)

*Kately* is particularly representative of the confusion that has followed *Dillon* and *Molien.* Faced with a compelling factual situation in which emotional distress was manifestly foreseeable, the court reached a just result. But that result was obscured by a strict reading of the *Dillon* guidelines and a flexible direct victim analysis.

Taken together, *Dillon* and *Molien* reduce to the following: if a plaintiff is a "direct victim," then a "pure" foreseeability test applies to determine liability for negligent infliction of emotional distress. However, if the plaintiff is a "bystander," the three *Dillon* criteria are invoked. (See Diamond, *Dillon v. Legg Revisited: Toward a Unified Theory of Compensating Bystanders and Relatives for Intangible Injuries* (1984) 35 Hastings L.J. 477, 494-495; Note, *Negligent Infliction of Emotional Distress: Reconciling the Bystander and Direct Victim Causes of Action* (1983) 18 U.S.F. L.Rev. 145, 152.)

It may be asked whether the distinction between a direct victim and a bystander is sufficiently clear to justify application of different tests. (See *Andalon v. Superior Court, supra,* 162 Cal.App.3d at pp. 608-609.) Why, for example, should plaintiffs such as Mr. Molien be permitted recovery while plaintiffs who fall within the ambit of the *Dillon* bystander scenario be denied recovery simply because they fail to satisfy all of the *Dillon* guidelines?

One commentator has aptly summarized the state of negligent infliction of emotional distress law after *Dillon* and *Molien:* "[C]ourts have applied the *Dillon* guidelines mechanically, viewing them as strict preconditions to recovery. This mechanical application has led to the erection of arbitrary limitations on recovery bearing little relation to the principles of foreseeability espoused so forcefully in *Dillon.* While in some instances mental distress is compensated, other equally foreseeable mental injuries are not. The result is feast or famine for the plaintiff depending on the fortuities of time, location, or characterization of the plaintiff as 'direct' or 'indirect.' " (Diamond, *supra,* 35 Hastings L.J. at p. 478, fns. omitted.)

## II.

Instead of providing the clear guidance that is sorely needed in this area of the law, the majority mechanically apply the *Dillon* guidelines.[7] Despite

---

[7]Compare the majority's treatment of Mrs. Ochoa with their treatment of Mr. Ochoa. (See maj. opn., *ante,* fn. 6.)

their reaffirmation that the guidelines should be treated as such (maj. opn., *ante*, at p. 170), even the majority convert the guidelines into strict "requirements." (See *id.*, at p. 165 & fn. 6.) They also narrowly construe *Molien*'s direct victim analysis, virtually limiting *Molien* to its facts.

The majority properly reject the "sudden occurrence" requirement which had been read into the second *Dillon* guideline. Their rejection is premised on the arbitrariness of that requirement. (Maj. opn., *ante*, at p. 168.) However, the rule they propose—that recovery is permitted "when there is observation of the defendant's conduct and the child's injury and contemporaneous awareness the defendant's conduct or lack thereof is causing harm" (*id.*, at p. 170)—is equally arbitrary.

While this rule obtains the correct result here, such will not always be the case. Liability should not hinge on the observation of the defendant's wrongdoing. Certainly, the foreseeability of emotional shock from seeing a loved one die or suffer injury does not always depend on whether the plaintiff observes the defendant's conduct or is "contemporaneously aware" that such conduct is causing the harm.

Under the majority's rule, any parent who arrives on the scene after an accident will not be permitted recovery. For example, a parent who is present with a child when a doctor administers an incorrect dosage which results in the child's death will be permitted recovery, while a parent who is asked to wait in an adjoining room while the doctor administers the same fatal dosage will not.

This court should not replace one arbitrary limitation with another, thereby perpetuating artificial distinctions which result in inequitable and unfair rulings. Instead, this court should embrace the foreseeability principles espoused in both *Dillon* and *Molien*. Both of those decisions emphasized that foreseeability of the risk was the critical element in determining liability. (*Molien, supra,* 27 Cal.3d at p. 922; *Dillon, supra,* 68 Cal.2d at p. 740.) Both recognized that "[i]n order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were *reasonably foreseeable.*" (*Id.*, at p. 739, italics added; *Molien, supra,* at p. 922.) Both instructed that liability had to be determined on a case-by-case basis and that "no immutable rule" could establish the extent of that liability for every circumstance in the future. (*Dillon, supra,* at p. 740; *Molien, supra,* at p. 923.)

Just as *Dillon* condemned the "hopeless artificiality" of the zone of danger rule (68 Cal.2d at p. 733), denounced "artificial abstractions which bar

recovery contrary to the general [principles of tort law]" (*id.*, at p. 747) and rejected " 'mechanical rules of thumb' " which are at variance with those general principles (*id.*, at p. 746), this court should reject the "mechanical rules of thumb" created by a rigid application of the *Dillon* guidelines and condemn the "hopeless artificiality" of the direct victim/bystander distinction. Just as *Molien* held that the defendant owed the plaintiff a duty to exercise care in that case "[b]ecause the risk of harm . . . was reasonably foreseeable" (27 Cal.3d at p. 923), this court should reaffirm that simple holding.

*Dillon* and *Molien* compel the conclusion that reasonable foreseeability *is* the appropriate test for determining whether a defendant is liable for the negligent infliction of emotional distress. Any other reading of those cases creates artificial distinctions and arbitrary limitations which in the end produce unjust results and mass confusion.

By embracing reasonable foreseeability to determine a defendant's liability, this court would conform the emotional distress area to all other areas of negligence law, thereby honoring its admonition in *Dillon* that there is "no good reason why the general rules of tort law, including the concepts of negligence, proximate cause, and foreseeability, long applied to all other types of injury, should not govern the case now before us." (68 Cal.2d at p. 746.) The test of reasonable foreseeability "facilitates rational risk spreading and correlates liability with the risks that the defendant should expect." (Diamond, *supra*, 35 Hastings L.J. at p. 500.) Most importantly, it provides a principled basis for determining liability.

Other courts, notably in England and Hawaii, have held that reasonable foreseeability is the appropriate test for determining a defendant's liability in these cases. In *McLoughlin* v. *O'Brian* (1982) 2 All Eng.Rep. 298, plaintiff's husband and three minor children were involved in an automobile accident caused by the defendants' negligence. One of the plaintiff's children was killed instantaneously and her husband and two other children were severely injured. At the time of the accident, the plaintiff was two miles away at home. She was informed of the accident about an hour later and was driven to the hospital. There, she saw the injured, bedraggled members of her family and heard that her two-year-old daughter had been killed. As a result, plaintiff suffered severe shock, organic depression and a change of personality. (*Id.*, at pp. 300-301.)

The House of Lords reversed both lower courts which had denied plaintiff's claim and held that she had stated a cause of action for emotional distress. Relying in part on *Dillon*, *McLoughlin* concluded that "common law principle requires the judges to follow the logic of the 'reasonably

foreseeable test' so as, in circumstances where it is appropriate, to apply it untrammelled by spatial, physical or temporal limits. Space, time, distance, the nature of the injuries sustained and the relationship of the plaintiff to the immediate victim of the accident are factors to be weighed, but not legal limitations, when the test of reasonable foreseeability is to be applied." (*McLoughlin, supra,* 2 All Eng.Rep. at p. 311.)

Since Lord Bridge's opinion in *McLoughlin* is particularly instructive, I would like to quote from it at length. He concluded that there were no policy considerations sufficient to justify limiting the liability of negligent tortfeasors, who have caused emotional distress, by some narrower criterion than that of reasonable foreseeability. (*Id.,* at pp. 319-320.) "A policy which is to be relied on to narrow the scope of the negligent tortfeasor's duty must be justified by cogent and readily intelligible considerations, and must be capable of defining the appropriate limits of liability by reference to factors which are not purely arbitrary." (*Id.,* at p. 319.) "[T]o draw a line by reference to any of [the *Dillon*] criteria must impose a largely arbitrary limit of liability. . . . [I]njustice would be wrought by any such hard and fast lines of policy as have been suggested." (*Ibid.*)

Lord Bridge concluded that "this is an area of the law of negligence where we should resist the temptation to try yet once more to freeze the law in a rigid posture which would deny justice to some who, in the application of the classic principles of negligence . . ., ought to succeed, in the interests of certainty, where the very subject matter is uncertain and continuously developing, or in the interests of saving defendants and their insurers from the burden of having sometimes to resist doubtful claims. I find myself in complete agreement with [Justice] Tobriner . . . that the defendant's duty must depend on *reasonable foreseeability* and—'must necessarily be adjudicated only upon a case-by-case basis. We cannot now predetermine defendant's obligation in every situation by a fixed category; no immutable rule can establish the extent of that obligation for every circumstance of the future.'" (2 All Eng.Rep., at p. 320, italics added.)

The courts of Hawaii have taken similar stands. In recognizing the tort of negligent infliction of emotional distress, the court in *Rodrigues* v. *State* (1970) 52 Hawaii 156, 52 Hawaii 283 [472 P.2d 509], held that liability in such cases would be determined "most justly by the application of general tort principles." (*Id.,* at p. 520.) Liability may be found where it was reasonably foreseeable that serious mental distress to the plaintiff could result from the defendant's conduct. (*Id.,* at pp. 520-521.)

*Rodrigues* was reaffirmed four years later in *Leong* v. *Takasaki* (1974) 55 Hawaii 398 [520 P.2d 758, 94 A.L.R.3d 471]. There, the court held that

"when it is reasonably foreseeable that a reasonable plaintiff-witness to an accident would not be able to cope with the mental stress engendered by such circumstances, the trial court should conclude that defendant's conduct is the proximate cause of plaintiff's injury and impose liability on the defendant for any damages arising from the consequences of his negligent act." (*Id.*, at p. 765.) The court noted that the *Dillon* guidelines "should not be employed by a trial court to bar recovery but should at most be indicative of the degree of mental stress suffered." (*Id.*, at p. 766.)[8]

Most recently, in a unanimous decision, the Hawaii Supreme Court reaffirmed the principles espoused in *Rodrigues* and *Leong*. In *Campbell* v. *Animal Quarantine Station, Etc.* (1981) 63 Hawaii 557 [632 P.2d 1066], the court upheld an award of damages for emotional distress suffered when the plaintiffs' dog died as a result of the defendants' negligence in transporting the dog to a private veterinarian hospital. None of the plaintiffs saw the dog die nor did any of them see its deceased body. They were informed of the dog's death by telephone the following day. (*Id.*, at p. 1067.)

The court found that *Rodrigues* and *Leong* were dispositive. (632 P.2d at p. 1068.) Reaffirming the view that the *Dillon* guidelines "should be utilized to determine the genuineness and degree of mental distress, rather than to bar recovery," the court indicated that there is no requirement that the tortious event be witnessed by the plaintiffs. (*Id.*, at p. 1069.)[9]

---

[8]The Hawaii Supreme Court retreated somewhat from the forceful views expressed in *Rodrigues* and *Leong* in *Kelley* v. *Kokua Sales and Supply, Ltd.* (1975) 56 Hawaii 204 [532 P.2d 673]. There, the court denied recovery where a grandfather living in California suffered a fatal heart attack when informed by telephone that his daughter and granddaughter had been killed and another granddaughter seriously injured as a result of an automobile accident in Hawaii. To limit a defendant's liability, the *Kelley* court required that plaintiffs be located within a reasonable distance from the scene of the accident. (*Id.*, at p. 676.) The court held that the defendants could not reasonably foresee the consequences to the grandfather since his location from the scene of the accident was "too remote." (*Ibid.*)

In a strongly worded dissent, Chief Justice Richardson, the author of *Rodrigues* and *Leong,* chastised the majority for drawing a line that "arbitrarily forecloses plaintiff's claim for negligent infliction of mental stress." (532 P.2d at p. 678.) He reminded the majority that in prior decisions, the court "saw fit to repose its trust in the trier of fact to separate the 'meritorious from the feigned' in accordance with traditional tort principles . . . ." (*Ibid.*) "It follows from our established case law that a negligent wrongdoer is liable for the consequences of his act. It is thus a deliberate policy decision that as between an innocent plaintiff and a negligent wrongdoer, that the latter must bear the loss. . . . [¶] Confining liability to a specific sphere of contemporaneity, as proposed, is all too inflexible. In effect the majority reinstates a scheme of arbitrary distinctions as to where liability ends that we expressly rejected in *Rodrigues*. The artificiality of the majority's position is too readily apparent." (*Ibid.*)

[9]An increasing number of other out-of-state decisions are permitting recovery for emotional distress in situations where the *Dillon* guidelines are not explicitly satisfied. (See, e.g., *Ferriter* v. *Daniel O'Connell's Sons, Inc.* (1980) 381 Mass. 507 [413 N.E.2d 690, 11 A.L.R.4th 518] [permitted recovery by a mother and children for emotional distress from

The posture taken by the courts of England and Hawaii supports the conclusion that reasonable foreseeability should play the primary role in determining a defendant's liability in such cases. As both jurisdictions recognized, the *Dillon* guidelines should be used as mere factors for the jury's consideration rather than as hard and fast requirements for recovery.[10]

Opponents of such an approach will undoubtedly proclaim that it will open the floodgates and result in unlimited liability. But as the majority observe, quoting from *Dillon,* " ' " [We] should be sorry to adopt a rule which would bar all such claims on grounds of policy alone, and in order to prevent the possible success of unrighteous or groundless actions. Such a course involves the denial of redress in meritorious cases, and it necessarily implies a certain degree of distrust, which [we] do not share, in the capacity of legal tribunals to get at the truth in this class of claim." ' " (Maj. opn., *ante,* at p. 171, citations omitted.)

Addressing a related argument in *Rodrigues,* the Hawaii Supreme Court recognized that its decision "does shift a part of the burden of administering claims of mental distress inordinately assumed by the courts to juries." (472 P.2d at p. 521, fn. 8.) However, "[a]s in other mental tort cases, the jury, representing a cross section of the community is in a better position to consider under what particular circumstances society should or should not recognize recovery for mental distress. . . . Moreover, the jury is no less 'without restraint' under the 'reasonable man' standard we have established

---

witnessing husband-father in a hospital after he had sustained quadriplegic injuries in a work-related accident; the Massachusetts Supreme Judicial Court stated that "[a] plaintiff who rushes onto the accident scene and finds a loved one injured has no greater entitlement to compensation for that shock than a plaintiff who rushes instead to the hospital. So long as the shock follows closely on the heels of the accident, the two types of injury are equally foreseeable." (*Id.,* at p. 697.)]; *Dziokonski* v. *Babineau* (1978) 375 Mass. 555 [380 N.E.2d 1295] [permitted recovery for a mother's wrongful death where mother suffered severe shock and died from a resulting heart attack while she was a passenger in the ambulance that was carrying her daughter to the hospital; daughter had been run over due to the defendant's negligence and mother who lived in the vicinity had arrived on the accident scene and had witnessed her injured daughter lying on the ground]; *Portee* v. *Jaffee* (1980) 84 N.J. 88 [417 A.2d 521] [permitted recovery by a mother who did not see original accident in which her young son was trapped between the outer door of a moving elevator and the wall of the shaft, but who was summoned to the scene and witnessed the agonizing slow death of her son from crushing injuries as police unsuccessfully sought to free the child]; *Mercado* v. *Transport of New Jersey* (1980) 176 N.J.Super. 234 [422 A.2d 800] [permitted recovery by a mother who learned of the accident minutes after it happened, went to scene and saw her injured son in the street]; *General Motors Corp.* v. *Grizzle* (Tex.App. 1982) 642 S.W.2d 837, [permitted recovery by a mother who arrived at scene moments after the accident].)

   [10]Two other jurisdictions have reached a similar conclusion. (See *Jaensch* v. *Coffey* (1984) 54 Austl. Argus L.R. 417; *Paugh* v. *Hanks* (1983) 6 Ohio St.3d 72, 6 Ohio B.R. 114 [451 N.E.2d 759].) For an excellent discussion proposing full recovery for reasonably foreseeable emotional distress injuries, see Bell, *The Bell Tolls: Toward Full Tort Recovery for Psychic Injury* (1984) 36 U.Fla. L.Rev. 333.

than in innumerable other negligence cases where a 'reasonable man' standard and general tort principles are applied and where the preliminary issue of whether the case presents questions on which reasonable men would disagree is for the court." (*Ibid.*)

*Dillon* itself indicated that the concept of reasonable foreseeability "limit[s] the otherwise potentially infinite liability which would follow every negligent act . . . ." (68 Cal.2d at p. 739.) *Dillon* also observed that "we cannot let the difficulties of adjudication frustrate the principle that there be a remedy for every substantial wrong." (*Ibid.*) In the face of the present confusion that exists in this area of the law, these statements should not be ignored.

Moreover, the *Molien* court, like the Hawaii court in *Rodrigues,* limited recovery to claims of *serious* mental distress. (*Molien, supra,* 27 Cal.3d at p. 930; *Rodrigues, supra,* 472 P.2d at p. 520.)[11] That limitation, employed with the reasonable foreseeability principle, adequately limits the class of potential claims. (Nolan & Ursin, *supra,* 33 Hastings L.J. at pp. 609-615; *Kelley* v. *Kokua Sales and Supply, Ltd., supra,* 532 P.2d at pp. 677-678 (dis. opn. of Richardson, C. J.).) "[T]he seriousness criterion adequately protects against fraud, trivial claims, and unlimited liability by requiring severe and debilitating harm." (Nolan & Ursin, *supra,* 33 Hastings L.J. at p. 620.)

It is also instructive to take note of Hawaii's experience. In its most recent decision, the Hawaii Supreme Court pointed out that "[s]ince our holding in *Rodrigues,* there has been no 'plethora of similar cases'; the fears of unlimited liability have not proved true." (*Campbell, supra,* 632 P.2d at p. 1071.)[12]

### III.

The *Dillon* guidelines originally envisioned as aids in determining reasonable foreseeability have been transformed into rigid, threshold requirements for recovery. Arbitrary, inconsistent and inequitable results are the rule. The *Molien* "direct victim" scheme, at least as construed by the majority,

---

[11] "[S]erious mental distress may be found where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." (*Rodrigues, supra,* 472 P.2d at p. 520; *Molien, supra,* 27 Cal.3d at p. 928; see also *Dillon, supra,* 68 Cal.2d at p. 740 [" 'Under general principles recovery should be had in such a case if defendant should foresee fright or shock severe enough to cause substantial injury in a person normally constituted.' "].)

[12] I recognize that Hawaii has imposed *one* arbitrary requirement to limit liability since its decision in *Rodrigues.* (See *Kelley* v. *Kokua Sales and Supply, Ltd., supra,* 532 P.2d at p. 676; but see *id.,* at p. 678 (dis. opn. of Richardson, C. J.), *ante,* at p. 193, fn. 8.)

only adds another layer of confusion. The majority's reasoning simply perpetuates the problem.

The answer lies in a careful reading of the grounds on which *Dillon* and *Molien* rest. An individual who suffers emotional distress, regardless of whether he or she is a "direct victim" or a "bystander," should be able to recover damages if (1) the emotional distress was reasonably foreseeable and (2) the distress suffered was serious. The concepts of reasonable foreseeability and serious injury, employed together, adequately protect against unlimited liability and provide a principled basis for determining it. *Dillon* should remain a guidepost to assist the trier of fact in determining liability.

As Justice Tobriner stated so eloquently, "Legal history shows that artificial islands of exceptions, created from the fear that the legal process will not work, usually do not withstand the waves of reality and, in time, descend into oblivion. . . . [¶] No good reason compels our captivity to an indefensible orthodoxy." (*Dillon, supra,* 68 Cal.2d at pp. 747-748.)[13]

---

[13]I also dissent from the majority's conclusion that plaintiffs have not pleaded facts sufficient to state a cause of action for intentional infliction of emotional distress. (See maj. opn., *ante,* at p. 165, fn. 5.) The majority apparently rely on the view that the defendant must act with "the purpose of causing the plaintiffs emotional distress." (*Ibid.*) To support that view, the majority cite cases involving threats and insults.

In my view, this situation more closely resembles cases involving unauthorized autopsies, where liability has been found even in the absence of a claim that the defendant acted with the purpose of causing emotional distress. (See, e.g., *Huntly* v. *Zurich General A. & L. Ins. Co.* (1929) 100 Cal.App. 201 [280 P. 163].)

A cause of action for intentional infliction of emotional distress may rest upon outrageous conduct by the defendant which is in "reckless disregard" of the probability of causing emotional distress. There does not have to be an intent to cause such distress. (See *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 296 [131 Cal.Rptr. 547], disapproved on another point in *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 740-741, fn. 9 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161].) "A defendant's conduct is in reckless disregard of the probability of causing emotional distress if he has knowledge of a high degree of probability that emotional distress will result and acts with deliberate disregard of that probability or with a wanton disregard of the possible results." (BAJI No. 12.77 (6th ed. 1977); see also Rest.2d Torts, § 46, com. i.) Given the lack of response by the defendants in the face of the severity of the symptoms exhibited by the decedent and the repeated pleas of Mrs. Ochoa, plaintiffs have pleaded facts sufficient to state a cause of action for intentional infliction of emotional distress.

It is also interesting to note that the majority conclude that plaintiffs stated facts sufficient to state a cause of action under 42 United States Code section 1983 which requires plaintiffs to state facts which show that defendants' medical care was "woefully inadequate" and thus resulted in the infliction of cruel and unusual punishment. (See maj. opn., *ante,* at pp. 176-177.) If defendants' conduct may have amounted to cruel and unusual punishment, does it not satisfy the "reckless disregard" test for an intentional infliction of emotional distress cause of action? Methinks there is an inconsistency here.